**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF SAVAGE INLAND MARINE, LLC, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | §<br>§<br>§<br>§ | CIVIL ACTION NO.  1:19-CV-536<br><br>JUDGE MICHAEL TRUNCALE |

Consolidated with

| | | |
|---|---|---|
| IN RE BLESSEY MARINE SERVICES | § | CIVIL ACTION NO. 1:20-CV-122 |

Consolidated with

| | | |
|---|---|---|
| IN RE ENTERPRISE MARINE SERVICES | §<br>§ | CIVIL ACTION NO. 1:20-CV-167 |

## I.      OPINION AND ORDER

During a multi-vessel fleeting operation on the morning of April 30, 2019, Claimant Justin Wood was a Jones Act seaman working for Petitioner Savage Inland Marine, LLC ("Savage") at Savage's Fina Fleet on the Neches River near Orange County, Texas.  [Dkt. 7].  Wood was working alongside Petitioner Blessey Marine Services, Inc. ("Blessey") employee Jeremy Turner to secure Barge EMS 368, owned by Petitioner Enterprise Marine Services LLC ("EMS"), to Savage's Fina Spud Barge and line up the remaining barges in the fleet.  Wood and Turner were both injured during the operation when a mooring line released from a deck fixture called an open chock on the EMS 368.

On October 29, 2019, Savage filed a complaint in federal court under the Limitation of Liability Act, 46 U.S.C. § 50501, seeking exoneration from or limitation of liability.  [Dkts. 1, 7].  Blessey and EMS thereafter filed respective federal limitation actions.  [Dkt. 44, p. 2].  On May 21, 2020, the three limitation actions were consolidated.  *Id.*  On December 16, 2020, the Court

granted Claimant Wood's motion to bifurcate, and thus the sole issue before the Court is to determine the appropriate apportionment of liability, if any, among the parties.  [Dkt. 106].  On January 21, 2021, the Court granted summary judgment on all claims of unseaworthiness made against EMS.  [Dkt. 147].

This matter came before the Court without a jury on January 25, 2021 and concluded on February 8, 2021.  During the trial, Savage settled with Claimants Wood and Blessey and, therefore, will not be a party in the state court damages trial but may be apportioned liability. [Dkt. 176].  The Court has carefully considered the testimony of all the witnesses, the exhibits entered into evidence during trial, and the record.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.  To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such.  To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II.   **FINDINGS OF FACT**

### A.  The Parties and the Barges in the Savage Fleet

1.  Savage Inland Marine, LLC ("Savage") is a limited liability company formed under the laws of Utah with its principal place of business in Louisiana. At all material times, Savage was the owner and operator of:

    a.  The M/V SAVAGE SENTINEL ("SAVAGE SENTINEL"), an inland pushboat that was captained by Stewart Jackson ("Captain Jackson") and is forty-six feet long with a twenty-foot beam and rated at 900 HP; and

     b. The Fina Spud Barge (also known as tank barge WTB 801) that was at all relevant times permanently moored, or "spudded," into the Neches River near the Orange County bank of the river.

2. Blessey Marine Services, Inc. ("Blessey") is a corporation formed under the laws of Louisiana with its principal place of business in Louisiana. At all material times, Blessey was the owner and operator of:

     a. The M/V CAPT. PAUL E. LORD ("PAUL E. LORD"), an inland pushboat that was captained by Niles Shoemaker ("Captain Shoemaker") and is sixty-seven feet long with a thirty-foot beam and rated at 1350 HP; and

     b. The tank barge WEB 406.

3. Enterprise Marine Services LLC ("EMS") is a limited liability company formed under the laws of the State of Delaware and doing business in the State of Texas. At all material times, EMS was the owner and operator of:

     a. The M/V AMANDA an inland pushboat that is seventy feet long with a twenty-eight-foot beam and rated at 1,590 HP;

     b. The M/V DELFRED ROMERO, an inland pushboat that is eighty-four feet long with a thirty-four-foot beam and rated at 2,000 HP;

     c. The EMS 368, a tank barge built in 2008 with principal dimensions of 297 feet in length and 54 feet in breadth;

     d. The EMS 369, a tank barge built in 2009 with principal dimensions of 297 feet in length and 54 feet in breadth; and

     e. The EMS 388, a tank barge built in 2014 with principal dimensions of 297 feet in length and 54 feet in breadth.

4. Justin Wood ("Wood") was a Jones Act employee of Savage and a deckhand and member of the crew of the SAVAGE SENTINEL on April 30, 2019.  Wood had approximately thirty-one days of work experience in the Savage Fina Fleet after attending Savage's five-day deckhand training school. Prior to April 30, 2019, Wood had never worked with Captain Jackson.

5. Jeremy Turner ("Turner") was employed by Blessey and a tankerman aboard the PAUL E. LORD on April 30, 2019.  Turner had approximately six years of experience onboard Blessey vessels and working with Captain Shoemaker.

## B.  The Savage Fleet on April 30, 2019

6. At approximately 08:00 hours on April 30, 2019, there were four loaded barges forming a single tier of the Savage Fina Fleet that were arranged and secured side-by-side to the upriver (i.e. port) side of the Fina Spud Barge as follows:

   a.  Barge EMS 369 was secured directly adjacent to the Fina Spud Barge. Barge EMS 369 was attended to by the M/V AMANDA.

   b.  Barge EMS 368 was secured directly adjacent to Barge EMS 369.

   c.  Barge WEB 406 was secured directly adjacent to Barge EMS 368. Barge WEB 406 was attended to by the PAUL E. LORD.

   d.  Barge EMS 388 was secured directly adjacent to Barge WEB 406. Barge EMS 388 was attended to by the M/V DELFRED ROMERO.

   e.  The SAVAGE SENTINEL was attending to the Savage Fina Fleet and positioned on the port side of the Barge EMS 388

f.  The Savage Fina Fleeting area, the tier of barges and vessels, and the approximate
area where Wood was injured is illustrated below:[1]



7.  That morning, Captain Jackson was the captain of the SAVAGE SENTINEL.  Captain
Glenn Bland ("Captain Bland") is the SAVAGE SENTINEL's regular captain, but he was
out that day.

8.  The weather was fair, warm, and dry; atmospheric conditions did not play a role in this
incident.  The current of the Neches River was slack and neither tide nor current played a
role in this incident.

## C.  The M/V AMANDA Departed with Barge EMS 369

9.  At approximately 07:20 hours, the crew of the M/V AMANDA planned to depart the
Savage Fleet with EMS Barge 369.[2]  Per EMS's Safety Management System ("SMS"), the
crew of the M/V AMANDA conducted a job safety analysis and completed a "Smart Card"

---

[1] Wood Ex. 41.  The EMS 369 and M/V AMANDA are not pictured because this illustration depicts the Savage Fina
Fleet after their departure.
[2] *See* Wood Ex. 36.

to address potential risks and hazards associated with untying the barge and departing the Savage Fleet.[3]

10. The crews of the Blessey and Savage tugs attending the tier of barges were not included in the M/V AMANDA's job safety analysis.  During an inland fleeting operation, it is not customary for a vessel crew departing a fleet to participate in a formal joint safety meeting with the remaining crews to address operations that will occur after the departing vessel has left the fleet.[4]

11. At approximately 08:10 hours, the M/V AMANDA departed the Savage Fleet with Barge EMS 369 after unmooring it from the Fina Spud Barge and Barge EMS 368.

12. Before the departure, Wood helped untie the EMS 369 from the EMS 368, and the SAVAGE SENTINEL pulled the three remaining barges laterally and away from the Spud Barge to create an opening for the M/V AMANDA to pull away.

13. EMS did not request assistance from Savage or Wood to untie the Barge EMS 369 from the Savage Fleet.[5]  The EMS crew members could have accomplished this operation without the involvement of the Savage deck crew.[6]

14. Blessey's Captain Shoemaker, Jeremy Turner, and the PAUL E. LORD were not involved in the departure of EMS 369.[7]

15. No incident or injury occurred during the unmooring of the EMS 369 and the departure of M/V AMANDA.[8]  As planned, the EMS 368 remained unmanned and located at the Savage Fina Fleet.

---

[3] *See id.*
[4] Captain Bland Trial Tr. at 34:11–15; *see also* trial testimony of Ron Campana Trial Tr.; Mike Ellis Dep. Test. at 27:1–19; Devon Swafford Trial Tr. at 36:17–19.
[5] Justin Wood Trial Tr. at 150:8–151:25.
[6] Reis Prevost Trial Tr. at 46:5-7; 99:24–100:12.
[7] Niles Shoemaker Trial Tr. at 90:19–21; Stewart Jackson Trial Tr. at 15:1–23.
[8] Justin Wood Trial Tr. at 150:8–151:25.

### D.  The Incident

16. After the M/V AMANDA departed with EMS Barge 369, a second operation took place to shift and resecure the fleet to close the gap between the Fina Spud Barge and the EMS 368. Wood and Turner were injured during this operation.[9]

17. At approximately 08:00 hours, Savage's Captain Jackson radioed Blessey's Captain Shoemaker.  Captain Jackson asked Captain Shoemaker to assist in shifting the Savage Fleet by using the PAUL E. LORD to provide ahead and astern force to the three-barge flotilla while Captain Jackson provided downstream force with the SAVAGE SENTINEL to line up and secure the flotilla alongside the Fina Spud Barge.  Captain Shoemaker agreed.[10]

18. It is customary for boats idle in the fleet, like the PAUL E. LORD, to assist the fleet boat when asked.[11]

19. Captain Jackson and Captain Shoemaker discussed the shifting operation and how the maneuver would unfold.[12]  The captains did not include Wood or Turner in this meeting, nor did they specifically discuss safety or how the deckhands would use the available deck fittings to complete the rigging.[13]

20. Captain Shoemaker then held a safety meeting with his tankerman Turner.[14]  They discussed in general terms the shifting of the remaining barges and re-mooring them to the Spud Barge.

---

[9] Justin Wood Trial Tr. at 152:18–23; Stewart Jackson Trial Tr. at 19:5–8; Niles Shoemaker Trial Tr. at 90:14–92:2.
[10] Stewart Jackson Trial Tr. at 18:17–19:8; Niles Shoemaker Trial Tr. at 11:9–12:6; 62:2–64:11.
[11] Niles Shoemaker Trial Tr. at 14:6–23.
[12] Id. at 64:17–25; 94:14–18.
[13] Stewart Jackson Trial Tr. at 19:5–8; 20:15–21:9; 25:23–26:10.
[14] Niles Shoemaker Trial Tr. at 23:13–17; 28:19–25.

21. Captain Jackson then talked with Wood over the radio and instructed him to tie off the EMS 368 to the Spud Barge.  They did not discuss line handling or safety.[15]  Captain Jackson did not hold a formal job safety analysis with Wood, even though Wood was using a winch, and such use requires a job safety analysis per Savage's policies.[16]

22. Wood and Turner did not conduct a formal safety meeting amongst themselves.[17]

23. Captain Shoemaker and Turner had never met Wood before the date of the incident and therefore Captain Shoemaker did not know his skill level.[18]

24. Wood and Turner then boarded the EMS 368 to secure the three-barge flotilla to the Fina Spud Barge by running a mooring line from the Fina Spud Barge to the Barge EMS 368.

25. Wood and Turner had hand-held radios with external speakers to communicate with their respective captains on separate radio channels.[19]

26. Captain Shoemaker was monitoring multiple radio channels and could hear requests made directly from Turner, as well as requests made between Wood and Captain Jackson.[20]

27. Wood used a separate channel to communicate with Captain Jackson directly.  Wood could not hear radio communication between Turner and Captain Shoemaker.[21]  Captain Shoemaker had no ability to talk directly to Wood, and Captain Jackson had no ability to talk directly to Turner.[22]

28. As the EMS 368 approached the Spud Barge, Wood radioed distances off from the Spud Barge.

---

[15] Justin Wood Trial Tr. at 26:15–19.
[16] Stewart Jackson Trial Tr. at 21:2–23:23.
[17] Justin Wood Trial Tr. 29:4–16.
[18] *Id.* at 27:1–2.
[19] *Id.* at 34:25–35:4–17; Jeremy Turner Trial Tr. at 21:17–25.
[20] Stewart Jackson Trial Tr. at 79:1–9; Jeremy Turner Trial Tr. at 24: 67; Niles Shoemaker Trial Tr. at 87:12–88:3.
[21] Justin Wood Trial Tr. at 34:22–35:12.
[22] *Id.* at 161:2–7.

29. At 08:17:54, the bow of the EMS 368 made contact with the bow of the Spud Barge. At that moment, Turner moved a mooring line hanging affixed to the corner of the Fina Spud Barge so that it would not be pinched and placed the line on an open chock deck fixture on the bow of the EMS 368.[23]

30. Approximately at the same time Turner placed the line on the open chock, Wood began using the winch to shackle and secure the breast line, a separate line running from the middle of the bow of the Fina Spud Barge. Wood looped the breast line around the centerline button on the EMS 368.[24]

31. Neither Turner nor Captain Shoemaker saw Wood use the winch.[25]

32. At 08:18:53,[26] Wood radioed that the barges needed "to come four feet head."[27] This radio call was heard by Captain Shoemaker.[28] At 08:19:12, Captain Shoemaker advised that he was "knuckled in gear" and radioed Turner. Captain Shoemaker asked, "Jeremy [Turner] do I need to come up even more?" Turner responded by saying, "yeah, come in there about another four to five feet." Wood did not hear this request.[29]

33. Sometime before 08:21:02, as the SAVAGE SENTINEL and the PAUL E. LORD shifted the fleet and pushed the flotilla toward the Fina Spud Barge, the mooring line rigged by Turner rolled up and out of the open chock due to the tension caused by the PAUL E.

---

[23] Justin Wood Trial Tr. at 57:16–23; *see also id.* at 43:25–44:2; 60:1–17; 84:2–11.
[24] *Id.* at 36:13–39:21.
[25] Stewart Jackson Trial Tr. at 40:22–41:13; Jeremy Turner Trial Tr. at 8:24–9:8.
[26] On April 30, 2019, the PAUL E. LORD was equipped with various cameras and an audio recorder, which recorded the VHF radio communications. The time stamps on these recordings are approximately two minutes and fifty-two seconds behind the actual time. Therefore, to be accurate, all times have been adjusted accordingly.
[27] Joint Pet'rs. Ex. 88.
[28] Niles Shoemaker Trial Tr. at 109:18–25.
[29] Joint Pet'rs. Ex. 88; Justin Wood Trial Tr. at 35:4–7; 160:21–161:7; 162:18–20.

LORD's additional forward movement, as well as the height differential of approximately six to eight feet between the Fina Spud Barge and the deck of the EMS 368.[30]

34. At 08:21:02, Captain Jackson indicated over the radio that a mooring line came loose. Thirteen seconds later, Captain Shoemaker expressed concern over the radio that Turner was maybe hurt.[31]

35. The line struck Wood and Turner in the head, and the two men claim to have temporarily lost consciousness.  Wood was bent down on his knees attempting to put the pin in the shackle upon the breast line when he was hit by the other mooring line.

36. Because Turner instructed Captain Shoemaker to move forward another four to five feet, Wood and Turner were standing in an area that became the line of fire at the time of the incident.  Turner and Wood could not complete the mooring task without standing where they were positioned.[32]

36. At the time of the incident, Captain Jackson was in the wheelhouse of the SAVAGE SENTINEL, about 150 feet away from Wood and Turner.[33]  Captain Shoemaker was about 300 feet away from the incident and 30 feet above the water.[34]

37. Blessey and Savage's crewmembers each had a Stop Work Authority that they were required to exercise if safety was compromised during an operation.[35]

38. The post incident scene is pictured below:[36]

---

[30] *See* Joint Pet'rs. Ex. 88.
[31] *Id.*
[32] Stewart Jackson Trial Tr. at 123:17–27:18; Glenn Bland Trial Tr. at 40:17–42:11; Marc Fazioli Trial Tr. at 54–55.
[33] Stewart Jackson Trial Tr. at 74:7–13.
[34] Niles Shoemaker Trial Tr. at 17:7–20; 47:12–14.
[35] Stewart Jackson Trial Tr. at 92:21–93:9; Jeremy Turner Trial Tr. at 28:7–29:4.
[36] *See* Wood Ex. 76



39. Wood prepared a hand drawn diagram after the incident:[37]



40. Due to the impact, Turner claims to have sustained memory loss of the rigging operation. Turner could not recall who put the line in the open chock or any other contested details about the incident.[38]

41. There were no purported witnesses to the line being placed on the open chock, although the evidence supports that Captain Shoemaker should have been able to see the men

---

[37] *See* Wood Ex. 49.
[38] Jeremy Turner Trial Tr. at 4:13–14; 8:24–9:13.

working.  Because Captain Shoemaker testified that he could see the top of the winch and the white line at the forward edge of the EMS 368 and its deck fittings, he was in a position to see who placed the rope on the open chock.[39]

42. Neither Savage nor Blessey trained its crews on the open chock deck fitting that was aboard the EMS 368.  The fitting is pictured below:[40]



43. The open chock is a deck fitting used as a fairlead to guide mooring lines when securing barges.  EMS has open chocks on its barges.  Neither Savage-owed nor Blessey-owned barges are equipped with open chocks.[41]

44. Because of their design, open chocks should not be used as a mooring point or when there is a height differential with an upward lead from the chock.[42]

45.  EMS barges with open chocks have regularly used the Savage Fleet since 2016.[43]

---

[39] Niles Shoemaker Trial Tr. at 15:13–15; 36:5–10; 51:8–52:3.

[40] *See* Wood Exhibit 45.

[41] *See* John Pierce Trial Tr. at 16:20–17:11; 136:3–16; Jeremy Turner Trial Tr. at 10:14–11:1; 17:12–23; Chance Burge Dept. Test. at 16:1–26.

[42] Stewart Jackson Trial Tr. at 134:6–19; Jeremy Turner Trial Tr. at 10:14–11:1; 17:12–23; Reis Prevost Trial Tr. at 76:20–77:4; John Pierce Trial Tr. at 16:20–17:18.

[43] Reis Prevost Trial Tr. at 93:9–13; 94:1–14; *Id.* at 89:16–90:6; *see also* Joint Pet'rs Ex. 101.

46. Shortly before the incident, Blessey's Captain Shoemaker was using his personal cellphone while operating M/V CAPT. PAUL E. LORD in violation of Blessey's policies.  Captain Shoemaker was talking on this phone for fourteen minutes from 08:05 to 08:19.[44]

47. Captain Shoemaker was not on his phone at the time of the incident.[45]

48. Captain Shoemaker's personal phone call distracted him from observing Wood and Turner as they completed the rigging.[46]

49. Blessey's shoreside management was aware that Blessey personnel violated its cellphone policies during operations, such as the April 30, 2019 operation.[47]

50. On the date of the incident, Blessey's Captain Shoemaker and tankerman Turner testified they were familiar with open chocks and their proper purpose and use.[48]  Wood, however, testified that he was not familiar with open chocks and their proper purpose and use.[49]

51. Savage, as the fleeter, was responsible for the Savage Fleet, and its employees were in charge of the fleeting operations, including shifting barges and resecuring the fleet.[50]  As Captain Jackson testified, he is always in control of the overall operation, and the Savage deckhand is in charge of the actual mooring operation.[51]

52. The M/V DELFRED ROMERO did not assist in this second operation, and Savage did not ask for the M/V DELFRED ROMERO's assistance.[52]

---

[44] Wood Ex. 23.
[45] Niles Shoemaker Trial Tr. at 122:10–15; 18:8–12.
[46] John Pierce Trial Tr. at 100:16–102:15; *see* Niles Shoemaker Trial Tr. at 15:13–15; 36:5–10; 51:8–52:3.
[47] *See* Ben Veracruz Dep. Test. at 21:19–8.
[48] *See* Niles Shoemaker Trial Tr. at 40:7–9; 72:17–20; Jeremy Turner Trial Tr. at 10:14–11:1; 17:12–23.
[49] Justin Turner Trial Tr. at 16:12–17:2; 142:1–2.
[50] Mike Ellis Dep. Test. at 50:21–51:16; 56:12–14; Justin Wood Trial Tr. at 76:21–78:5; 135:23–136:23.
[51] Stewart Jackson Trial Tr. at 11:19–20; 81:23–82:6; 86:10–25.
[52] *Id.* at 83:3–7; Glenn Bland Trial Tr. at 34:4–9.

53. At the time of the incident, EMS was not participating in the fleeting operations and had no crew, agents, servants, or employees on Barge EMS 368.[53]  The M/V AMANDA and Barge EMS 369 were not present and were positioned well down the channel.[54]

**E.  The Aftermath**

54. Captain Jackson and Captain Shoemaker radioed Wood and Turner to check on their status immediately after seeing them get hit by the line.  Captain Jackson radioed, "Did that line come untied or did it break? You all alright up there?"[55]

55. Captain Jackson called the Savage fleet office on his cell phone and reported the incident. Captain Jackson then left the wheelhouse of the SAVAGE SENTINEL and went to the rake of the EMS 368 while Captain Shoemaker sent the PAUL E. LORD's relief captain to assist.[56]

56. Either Wood or Turner radioed, "Hey we can't see" at 8:22:14, approximately one minute fifteen seconds after the line coming off the open chock.[57]

57. Turner can be heard giving instructions to Captain Shoemaker shortly after he was struck in the face.[58]

58. When Captain Jackson arrived on the deck of the EMS 368 after the incident, he pulled a loop of line (or "bright") onto the deck.  He did not remember where the shackle was located.[59]

59. Savage's Port Captain Chance Burge, along with co-worker Justin Hartsfield, immediately took a jon boat to the scene.

---

[53] Marc Fazioli Trial Tr. at 141: 16–25.
[54] *Id.* at 139:1–14; *see* Stewart Jackson Trial Tr. at 83:11–19; Reis Prevost Trial Tr. at 99:24–100:12.
[55] Wood Ex. 25.
[56] Stewart Jackson Trial Tr. at 47:4–19; Niles Shoemaker Trial Tr. at 34:4–9.
[57] Wood Ex. 25.
[58] *See* Pet'rs Ex. 88.
[59] Stewart Jackson Trial Tr. at 75:19–22.

60. Either Captain Jackson or Captain Burge properly re-rigged the Barge EMS 368 to the Fina Spud Barge.

## F.  The Reports

61. Savage completed its investigation ten months after the incident, on February 6, 2020, and found the following root causes: (1) Savage's inadequate training on deck fittings; and (2) Savage faulted Wood for allegedly standing in the line of fire and for failing to recognize the line was rolling out of the chock.[60]  Savage did not conclude that Wood placed the rope on the open chock.

62. Blessey completed its investigation on May 22, 2019 and faulted itself. The stated root causes were as follows: (1) improper use of equipment; (2) loss of situational awareness by Turner, (3) inadequate job planning, and (4) lack of familiarity with the equipment.[61]

63. EMS did not investigate the incident.[62] Neither the Savage Incident Investigation Report nor the Blessey Incident Report identify any conduct on the part of EMS that caused or contributed to the incident.[63]

## G.  Wood's Training

64. Wood was a new hire for Savage and had approximately thirty-one days of hands-on work experience in the fleet prior to the incident.[64]

65. Wood attended Savage's five-day deckhand training school, where he received no training on open chocks and their proper use.[65]

---

[60] *See* Wood Ex. 1.
[61] *See* Wood Ex. 20.
[62] Reis Prevost Trial Tr. at 9–16.
[63] *See id.*; Joint Pet'rs Ex. 37.
[64] *See* Justin Wood Trial Tr. at 78:22–79:1.
[65] *Id.* at 16:12–24; 88:19–23.

66. EMS barges with open chocks regularly used the Fleet, and Savage was aware that barges with open chocks were being moored at the Fleet.[66]

67. Savage did not communicate to Captain Jackson that Wood was a new hire.  Captain Jackson had never met Wood before the date of the incident and was unaware of his skill level.[67]

68. Captain Glenn Bland also trained Wood, but Captain Bland was off on the day Wood was injured.  Captain Bland testified that he had never seen Wood use an open chock nor had he trained Wood on open chocks.[68]  Captain Bland also testified that he often did not follow Savage's written procedures requiring job safety analysis plans.[69]

69. Savage's deckhand training manual does not reference line of fire.[70]  However, Wood testified that on the date of the incident he was aware of the hazards and dangers of placing himself in the line of fire or zone of danger of a rope under tension.[71]

70. Savage's shoreside management was aware that its vessel was going to attempt this maneuver despite the fact that (1) the written job safety analysis procedure was not followed by its captains to reduce and eliminate risk; and (2) there was inadequate training on deck fittings used by the barges in its fleet.

71. Blessey's shoreside management was aware that (1) its crews did not follow the strict no cell phone policy; and (2) its vessel, PAUL E. LORD, was going to assist the SAVAGE SENTINEL with this maneuver.

---

[66] Reis Prevost Trial Tr. at 93:9–13; 94:1–14; Chance Burge Trial Tr. at 32:17–33:2.
[67] Stewart Jackson Trial Tr. at 12–13.
[68] Glenn Bland Trial Tr. at 20: 19–24.
[69] *Id.* at 27:9–22; 34.
[70] *See* Wood Ex. 11.
[71] Justin Wood Trial Tr. at 100:14–25.

### III.   <u>CONCLUSIONS OF LAW</u>

**A.  Jurisdiction**

1.  The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333 and Federal Rule of Civil Procedure 9(h).  Venue is proper in the Eastern District of Texas.  Jurisdiction and venue are not contested by the parties.  The substantive law that governs this case is the general maritime law.

**B.  Limitation of Liability**

2.  Vessel owners, like Savage, Blessey and EMS, who face liability from a maritime incident may file a claim pursuant to the Limitation of Liability Act ("Limitation Act"), 46 U.S.C. § 30505.

3.  The Limitation Act provides vessel owners the opportunity to limit their liability for damages arising from a maritime accident to the value of the vessel and its freight, provided that the accident occurred without the shipowner's "privity or knowledge" of the negligent actions causing the damage.  *Id.*; *see also Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001).

4.  In deciding whether to limit liability, courts follow a two-step analysis.  First, the court determines what acts of negligence or conditions of unseaworthiness, if any, caused the accident.  *See Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).  The claimant seeking to dissolve limitation bears the burden of proving negligence or unseaworthiness. *Id.*  Second, if the claimant establishes negligence or unseaworthiness, the burden shifts to the vessel owner to prove that it had no knowledge or privity of these negligent acts or conditions of unseaworthiness. *Id.*; *see Petition of Kristie Leigh Enters., Inc*., 72 F.3d 479,

481 (5th Cir. 1996); *see generally* Thomas J. Schoenbaum, 2 Admiralty and Maritime Law § 15.8 (6th ed. 2018).

5. The parties raise two types of negligence claims: (1) Jones Act negligence and (2) general maritime law negligence.

## C.  Jones Act Negligence

6. Wood's assertions of negligence against Savage are governed by the Jones Act.  46 U.S.C. § 30104.  The Jones Act gives "[a] seaman injured in the course of employment" a cause of action for his employer's negligence.  *Id.*; *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995).

7. Under the Jones Act, an employer has the duty to "provide his seaman employees with a reasonably safe place to work."  *Landry v. Chet Morrison Contractors, LLC*, No. CIV.A. 11-48, 2011 WL 6140740, at *2 (E.D. La. Dec. 9, 2011) (quotations omitted).  An employer breaches that duty if it fails to exercise ordinary prudence and is thereby negligent. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338, 339 (5th Cir. 1997) (en banc).  In other words, an employer breaches its duty if it disregards a danger that it "knew or should have known."  *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.1989) (quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988)).

8. A plaintiff seeking relief under the Jones Act must also show causation, but it is "not [a] demanding" standard.  *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008); *see In re Cooper/T. Smith*, 929 F.2d 1073, 1076 (5th Cir. 1991) ("The burden to prove causation in a Jones Act case is 'very light' or 'featherweight.'" (quotations omitted)). Causation in this context requires only that the employer's negligence "played any part, even the slightest, in producing the injury."  *Johnson*, 544 F.3d at 302 (citing *Chisholm v.*

*Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982)).   Therefore, if the Jones Act employer's negligent act was the cause, in whole or in part, of injury to a seaman employee, then the employer is liable under the Jones Act.   *Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 205 (5th Cir. 2019); *Schindler v. Dravo Basic Materials Co., Inc.*, 790 F. App'x 621, 623 (5th Cir. 2019).

9.  Proximate cause is not required to prove Jones Act negligence.  *Gowdy*, 925 F.3d at 208.

## D.  General Maritime Law Negligence

10.  A Jones Act seaman like Wood may also sue non-employer third parties like EMS and Blessey for general maritime law negligence.  *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498 (1971); *Scarborough v. Clemco Indus.*, 391 F.3d 660, 667 (5th Cir. 2004) (a seaman may not recover for Jones Act negligence against a party that did not employ him).  Blessey's claims against EMS are also governed by general maritime law.

11.  Under general maritime law, a showing of negligence requires: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached the duty; (3) the plaintiff sustained damages; and (4) the defendant's wrongful conduct caused the plaintiff's damages.  *ADM Int'l SARL v. River Ventures, LLC*, 441 F. Supp. 3d 364, 375 (E.D. La. 2020) (citing *In re Cooper/T. Smith*, 929 F.2d at 1077).

12.  "The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law."  *Withhart v. Otto Candies, LLC*, 431 F.3d 840 (5th Cir. 2005) (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)).

13. In the context of maritime tort cases, a plaintiff is owed a duty of ordinary care under the circumstances. *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir.1980); *see Kermarec*, 358 U.S. at 632.

14. The determination of the existence and scope of a duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) ("[D]uty may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct." (quotations omitted)); *Ortega Garcia v. United States*, 427 F. Supp. 3d 882, 889 (S.D. Tex. 2019). A harm is reasonably foreseeable if "harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result" of a defendant's conduct. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010); *In re Cooper/T. Smith*, 929 F.2d at 1077 (citing *Daigle*, 616 F.2d at 827.

15. The negligence must also be the legal cause of the damage, which is something more than "but for" causation—"the negligence must be a substantial factor in causing the injuries." *In Re Great Lakes*, at 213–14 (citation and quotations omitted); *see Dixie Marine, Inc. v. Q Jake M/V*, No. CV 16-12415, 2017 WL 3600574, at *10 (E.D. La. Aug. 22, 2017).

**E. Claims against Savage**

16. Wood, Blessey, and EMS have each asserted claims against Savage for negligence. Wood's claims for negligence against Savage are governed by the Jones Act. EMS and Blessey's claims for negligence against Savage are governed by general maritime law.

17. Fault must be apportioned to all parties, including settling parties such as Savage, so that any damages later found by the jury in the state court trial on damages can be allocated

according to each parties' percentage of fault. *McDermott v. AmClyde and River Don Castings, Ltd.*, 511 US 202, 212-217 (1994).  Therefore, the Court's analysis of Savage's negligence is only for purposes of apportioning fault.

18. "A fleet operator has the responsibility for insuring proper resecuring of barges after other barges have been removed from the fleet." *Lower River Ship Servs., Inc. v. Casteel, Inc.*, No. CIV. A. 89-2346, 1991 WL 13867, at *5 (E.D. La. Jan. 30, 1991) (citing *John I. Hay Co. v. The Allen B. Wood*, 121 F. Supp. 704, 708 (E.D. La. 1954), *aff'd sub nom. Martin Oil Serv. v. John I. Hay Co.*, 219 F.2d 237 (5th Cir. 1955)).

19. "Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of their berths and in properly and securely mooring them." *Lower River*, 1991 WL 13867, at *6 (citing *Wisconsin Barge Line, Inc. v. The Barge Chem 301*, 390 F. Supp. 1388, 1395 (M.D. La. 1975), *rev'd on other grounds*, 546 F.2d 1125 (5th Cir. 1977)).

20. Having reviewed the witness' testimony, the exhibits admitted into evidence, and the parties' briefing, the Court finds that Savage was negligent and that its negligence was a legal and proximate cause of Claimant Wood's injuries.

21. Savage, as the fleet owner and operator, should have trained Wood on the proper use of open chocks and the dangers of using them as mooring points.  EMS barges with open chocks regularly used the Savage Fleet.  Thus, Savage likely knew, or at the very least should have reasonably anticipated, that its deckhands would be responsible for safely and properly mooring barges with open chocks.  Because Savage did not train its deckhands like Wood on the use of open chocks, Savage was negligent in assigning Wood to perform a task that Wood was not adequately trained to perform.

22. If Savage had trained its employees on open chocks, the crew of the SAVAGE SENTINEL would have been able to safely conduct this mooring operation and advise all those involved on which deck fittings were appropriate to use and their potential hazards. Therefore, Savage's failure to train its employees on the proper use of open chocks substantially contributed to and was a proximate cause of the accident.

23. Savage's failure to conduct a safety meeting with the captains and deckhands involved also substantially contributed to and was a proximate cause of the accident.  Savage should have required Captain Jackson to conduct a safety meeting with Captain Shoemaker, Turner, and Wood prior to the maneuver in question.

24. Had there been a proper pre-voyage safety meeting, the personnel involved in the maneuver would have discussed in detail how to safely rig the fleet to the barge and minimize the associated risks, and would likely have been able to avoid incident.

25. There was clear miscommunication on the day of the incident, in large part due to the lack of planning and the inability of the crews to communicate with the captains of the assisting vessels.

26. Savage's own incident investigation report concluded that a root cause of the incident was Savage's inadequate training program where deckhands receive "no training on [deck] fittings used on the barges of other companies where they may be exposed within the fleeting areas."[72]

27. Therefore, Savage failed to provide adequate training or instruction to its deckhands on open chocks, failed to plan and execute the mooring operation safely, and failed to require its captains to execute a proper safety meeting prior to the maneuver in question.

---

[72] Wood Ex. 1.

28. Together, Savage's conduct created an unreasonable safety hazard and constituted a breach of Savage's duty of care as a fleet operator. These acts and omissions were substantial factors and proximate causes in creating the unsafe conditions that led to Wood's injuries. Accordingly, the Court finds that Savage is liable for its negligence, both under the Jones Act and general maritime law negligence.

## F.  Claims against Blessey

29. The negligence claims against Blessey are governed by general maritime law.

30. The Court finds that Blessey is liable for general maritime negligence.

31. "A person who voluntarily assumes a duty owed by another and then breaches that duty becomes liable to one who is injured as a result of the breach." *Tidewater Marine v. Sanco Int'l, Inc*., 113 F. Supp. 2d 987, 999 (E.D. La. 2000) (citing *Miss Janel, Inc. v. Elevating Boats, Inc.*, 725 F. Supp. 1553, 1567 (S.D. Ala. 1989); *see generally Indian Towing Co. v. United States*, 350 U.S. 61 (1955).  Blessey owed a duty to Wood and failed to execute that duty with reasonable care.

32. There is credible evidence supporting the finding that Blessey was negligent under general maritime law and that its failure to exercise reasonable care was a legal and proximate cause of Claimant Wood's resulting injuries.

33. Specifically, there is evidence that Turner placed the second line on the open chock and that Captain Shoemaker (1) failed to execute a safety plan with his deckhand prior to the maneuver in question and (2) was inattentive and distracted during the rigging operation.

34. Unlike Savage, Blessey was not the fleet owner and therefore had no duty to train its employees like Turner on every deck fixture in the Savage Fleet.  Nevertheless, Blessey should have held a proper safety meeting with all Savage personnel, which would have

provided both crews the opportunity to discuss the operation in detail and minimize the associated risk.

35. Shortly before the incident, Blessey's Captain Shoemaker violated company policies by using his personal cell phone for fourteen minutes while operating the PAUL E. LORD and shifting the Savage Fleet.

36. Had Captain Shoemaker been attentive to the operation, he would have seen Turner place the rope on the open chock, would not have moved the PAUL E. LORD forward an additional four to five feet, and would have exercised his Stop Work Authority to safely avoid the resulting injuries.

37. Blessey's shoreside management was aware that Blessey personnel violated its cellphone policies during operations.

38. Captain Shoemaker provided the additional force that caused the rope to come under tension and slip off the open chock, injuring both Turner and Wood.

39. Blessey's own incident report repeats three separate times that the mooring line on the open chock was put under tension by the PAUL E. LORD and concludes that a root cause of the incident was "inadequate job planning."[73]

40. Blessey personnel therefore failed to exercise reasonable care or implement and enforce proper pre-voyage planning requirements. These acts and omissions were substantial factors and proximate causes in creating the unsafe conditions that led to Wood's injuries. Accordingly, the Court finds that Blessey is liable for its negligence.

## G.  Claims against EMS

41. The negligence claims against EMS are governed by general maritime law.

---

[73] Wood Exhibit 20.

42. The Court finds that EMS was not negligent because it owed no duty to the parties after it entrusted Savage with a seaworthy barge, and that it otherwise acted with ordinary prudence in departing the Savage Fleet.

43. At the time of the Incident, Savage was owner and operator of the fleet and the bailee over the Barge EMS 368.  When a vessel is delivered to a bailee in good condition, a bailment is established and imposes upon the bailee a duty of ordinary care.  *United Barge Co. v. Notre Dame Fleeting & Towing Serv., Inc.*, 568 F.2d 599, 602 n.5 (8th Cir. 1978).  Even though a fleeter is not an absolute insurer to the barges in which it is entrusted, *Dow Chem. Co. v. The Barge UM-23B*, 424 F.2d 307, 311 (5th Cir. 1970), "[t]he operator of a fleeting facility as bailee has the responsibility of caring for the barge after it is committed to its custody." *Am. River Transp. Co. v. Paragon Marine Serv., Inc.*, 213 F. Supp. 2d 1035, 1059 (E.D. Mo. 2002).

44. On April 23, 2019, seven days prior to the Incident, Barge EMS 368 arrived in a seaworthy condition at Savage's FINA Anchorage Fleet along with EMS vessel the M/V AMANDA.

45. On the morning of the Incident, the M/V AMANDA departed with Barge EMS 369 and left Barge EMS 368 in the Savage Fleet.

46. Because the EMS 368 was left in the exclusive care, custody, and control of Savage, a bailment relationship was established, and Savage assumed a duty to exercise reasonable care over the EMS 368.  *See Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5th Cir. 1954) ("When a vessel is placed at a [w]harf or dock for storage . . . a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock" which "imposes upon the bailee the duty of ordinary care."); *see also In re Ingram*

*Barge Co.*, No. CIV.A. 05-4419, 2008 WL 906303, at *5 (E.D. La. Mar. 31, 2008), *aff'd,* 335 F. App'x 375 (5th Cir. 2009).

47. EMS had no crew present onboard the EMS 368 at the time or place of the Incident, and EMS was not participating in the operation to resecure the Savage Fleet at the time of the Incident.[74]  EMS was not even aware of Wood's injuries until Savage provided notice of its limitation action six months after the incident.

48. Thus, EMS was a non-present, non-actor and owed no duty to Wood or the other parties after the M/V AMANDA departed the Savage Fleet.  *See Daigle*, 616 F.2d at 827 (holding that the master did not know and had no reason to know that the vessel's maneuvering endangered the plaintiff and thus was not legally obliged to warn to the plaintiff of the vessel's movements).

49. A maritime tortfeasor is "accountable only to those to whom a duty is owed."  *In re Signal Intern., LLC*, 579 F.3d 478, 491 (5th Cir. 2009).  The determination of the alleged tortfeasor's duty is a question of law for the Court to decide.  *Id.* at 490.  Where there is no duty, there can be no breach.  *Canova v. United States*, No. CIV. A. 92-2591, 1993 WL 515740, at *3 (E.D. La. Dec. 9, 1993) (citing *Crane v. Texas*, 759 F.2d 412, 430 (5th Cir. 1985)).

50. Therefore, because the duty to exercise reasonable care over the EMS 368 rested with Savage and not EMS at the time of the incident, EMS owed no duty to Wood, Savage, or Blessey that could have been breached.

51. EMS also had no duty to warn Savage that the EMS Barge 368 was equipped with a variety of deck fixtures, including open chocks.  These fixtures are not "deficiencies" nor are they

---

[74] *See* Reis Prevost Trial Tr. at 99:24–100:12; Niles Shoemaker Trial Tr. at 90:22–92:2; John Pierce Trial Tr. at 151:12–13; Justin Wood Trial Tr. at 152:24–153:24; Stewart Jackson Trial Tr. at 83:11–19.

"hidden hazards," and even if they were, Savage was aware that EMS vessels equipped with open chocks were in its fleet.  *See Dixie Marine, Inc. v. Q Jake M/V*, No. CV 16-12415, 2017 WL 3600574, at \*11 (E.D. La. Aug. 22, 2017) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977)) ("There is no duty to warn if the wharf's hazard or deficiency is open and obvious to those in control of the vessel or if those persons have actual knowledge of the condition.").

52. Finally, the operation of untying the Barge EMS 369 from the Fina Spud Barge and the Barge EMS 368 and removing the Barge EMS 369 from the Savage Fleet was a separate and distinct operation from the subsequent shifting of the flotilla in the Savage Fleet by Savage and Blessey and the resecuring of the flotilla to the Fina Spud Barge by Savage and Blessey personnel.[75]

53. The M/V AMANDA and its crew exercised prudent seamanship and reasonable care while departing the Savage Fleet on the morning of the incident.  The crew held a safety meeting, documented it, and then safely departed with Barge EMS 369 without any casualty.

54. EMS was not required to conduct a second safety meeting with Savage and Blessey crew members to discuss the hazards associated with a separate operation in which it would have no role and which would occur after EMS departed the Savage Fleet.  A formal joint safety meeting to discuss two separate and distinct operations is not required by EMS's policies, nor is it customary in the maritime industry.[76]

55. EMS, therefore, had no duty to advise Wood regarding Savage and Blessey's subsequent fleeting operations.

---

[75] *See* Glenn Bland Trial Tr. at 33:18–34:9; Niles Shoemaker Trial Tr. at 90:14–17; Walter Brethwit Trial Tr. at 43:25–44:21; Reis Prevost Trial Tr. at 6:20–8:4; 104:21–23; 107:10-108:9; Mike Ellis Dep. Test. at 47:6–9; 52:18–53:1.
[76] Mike Ellis Dep. Test. at 52:18–53:1; Glenn Bland Trial Tr. at 34:11–15; Reis Prevost Trial Tr. at 71:5–10; *see generally* Trial Tr. Ron Campana.

56. EMS committed no acts or omissions that caused or contributed to the incident because EMS had no presence at the Savage Fleet in connection with the Barge EMS 368 at the time of the Incident.

57. None of the claimants have met their burden to show that any of the alleged injuries in this case were caused by the negligence of EMS, its crews, or its vessels or any unseaworthy condition of EMS's vessel.

58. Therefore, EMS is not liable for general maritime negligence. EMS is entitled to exoneration from liability under the Limitation of Liability Act, 46, U.S.C. § 30505.

**H. No Contributory Negligence by Wood**

59. Petitioners contend that Wood was negligent, and that Wood's negligence caused or contributed to causing his injury. Petitioners have the burden of proving that Wood was contributorily negligent. *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008). If Wood were guilty of contributory negligence by contributing to his injury, he nevertheless may recover. *See Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 160 (2007). However, the amount of his recovery will be reduced by the extent of his contributory negligence. *Id.*

60. "To establish that a seaman is contributorily negligent, an employer must prove negligence and causation." *Johnson*, 544 F.3d at 302. A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997). "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment, but also his own experience, training and education." *Id.*

61. To establish causation, an employer must show that the seaman's negligence "played any part, even the slightest, in producing the injury." *Johnson*, 544 F.3d at 302 (quoting *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir.1982)). Even under the Jones Act, however, a party must establish more than mere "but for" causation. *See Gavagan v. United States*, 955 F.2d 1016, 1019–20 (5th Cir.1992) ("The negligence must be a 'legal cause' of the injury.").

62. The Court finds that Justin Wood acted with ordinary prudence under the circumstances and did not cause or contribute to his injuries.

63. Due to Savage and Blessey's decision to not include Wood or Turner in a safety discussion, the two men did not have clear roles in the rigging operation. As a result, Wood did not see Turner place the rope on an open chock, and he had no opportunity to exercise his Stop Work Authority or to move away from the newly created line of fire.

64. Even if Wood had seen Turner place the mooring rope on the open chock, Wood was unaware Turner's conduct was hazardous due to Savage's deficient training program. As a result, Wood had no understanding of open chocks in this context, their intended use, or the risks associated of using them in high-low rigging operations.

65. Wood also could not hear the radio communication between Blessey's Captain Shoemaker and Turner, and he was unaware that the PAUL E. LORD would cause the rope to come under tension with its additional forward movement.

66. Therefore, the accident was not due to the contributory negligence of Wood.

67. Instead, as detailed above, Savage and Blessey were negligent and their negligence was the legal cause of Wood's injuries.

68. In sum, the Court finds that Claimant Wood was not contributorily negligent and that he satisfied his burden of proving negligence as to Savage and Blessey, but not as to EMS.

## I. <u>Privity or Knowledge</u>

69. Next, for Blessey to sustain its limitation defense, the burden of proof is on it to demonstrate "lack of privity or knowledge of the dangerous condition that caused the injury." *Brister v. AWI, Inc.*, 946 F.2d 350, 355 (5th Cir. 1991); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).

70. "Privity or knowledge implies some sort of 'complicity in the fault that caused the accident.'" *Brister*, 946 F.2d at 355 (quoting *Nuccio v. Royal Indem. Co*., 415 F.2d 228, 229 (5th Cir. 1969)).   Because it has no fixed meaning, the question of "privity or knowledge must turn on the facts of the individual case." *Id.* at 355–56 (quoting *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975)).

71. "[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991).

72. When the shipowner is a corporation, knowledge "is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." *Id.* at 1473–74; *see also In re Omega Protein, Inc.*, 548 F.3d 361, 371 (5th Cir. 2008).   Privity or knowledge is therefore deemed to exist if the shipowner has the means of obtaining knowledge, or if it would have obtained the knowledge by reasonable inspection. *China Union Lines Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966);

73. For purposes of limitation, a corporate vessel owner is charged with the privity or knowledge of its managing officers "whose scope of authority includes supervision of that part of the business out of which the loss or injury occurred." *Continental Oil v. Bonanza Corp.*, 706 F.2d 1365, 1367 (5th Cir. 1983) (citations omitted); *ADM Int'l*, 441 F. Supp. 3d at 381.

74.  Supervisory shore personnel are managing agents of the corporate vessel owner, and their knowledge and privity "is sufficient to charge a corporation."  *China Union Lines*, 364 F.2d at 787; *Pennzoil*, 943 F.2d at 1474 (denying limitation based on the knowledge of "shore-based managing officials").

75. Blessey had privity and knowledge of Captain Shoemaker's negligent conduct.  There is substantial evidence that Blessey's shore-based managing officials knew that Captain Shoemaker, as well as other captains, operated Blessey's vessels while using their cell phones for personal calls in violation of company policies.

76. Blessey's knowledge of this history is precisely the sort of knowledge that vitiates the right of vessel owners to limit liability. *See Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir.1977); *Pennzoil*, 943 F.2d at 1474 (affirming district court's finding that the vessel owner did not establish lack of privity or knowledge where its managing officials had knowledge of the vessel operator's repeated acts of negligence); *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994) (same).

77. Blessey therefore did not satisfy its burden of proving that it lacked privity and knowledge of the negligence that caused or contributed to this incident.  Accordingly, Blessey is not entitled to limit its liability to the value of the PAUL E. LORD plus its pending freight.

78. It is important to note, however, that Blessey did not have privity or knowledge of the negligent conduct of Jeremy Turner, the tankerman who placed the rope on the open chock. A crewmember's mistake, when he is otherwise competent and the owner exercised reasonable care in selecting him, does not bar limitation of liability. *Petition of Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996); *Continental Ins. Co. v. L&L Marine Transp. Inc.*, 2017 WL 4844272, at *3 (E.D. La. Oct 26, 2017).

79. Turner was a properly trained and competent tankerman. There is no evidence that he had a pattern of improper or unsafe behavior during his eight years of working for Blessey as a tankerman.

80. Therefore, Blessey had no reason to know that Turner would place a mooring line on the open chock on the date of the incident. Without actual or constructive knowledge of Turner's conduct, it was proper for Blessey to entrust Turner to observe the safety rules of the industry, which he well knew. *See In re Omega Protein, Inc.*, 548 F.3d at 374 (the privity and knowledge standard "only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence"); *Coryell v. Phipps*, 317 U.S. 406, 412 (1943) ("One who selects competent men . . . and who is not on notice . . . cannot be denied the benefit of . . . limitation."). As such, Turner's negligent conduct was an isolated incident that cannot be imputed to Blessey for purposes of the limitation act.

## J.  Apportionment of Fault

81. In maritime tort cases where more than one party is responsible, courts apportion liability based on fault according to the rules of comparative negligence. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409–11 (1975); *ADM Int'l*, 441 F. Supp. 3d at 377.

82. Accordingly, this Court will apply the rule of comparative negligence in determining the allocation of liability for damages between Savage and Blessey in this case.

83. The "apportionment [of fault] is not a mechanical exercise that depends upon counting up the errors committed by [the] parties. The trial court must determine, based upon the number and *quality* of faults by each party, the role each fault had in causing the [injury]." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 370 (5th Cir. 2006) (footnotes omitted) (emphasis added).

84. As between the two parties in this case that are liable for negligence, the Court finds that Blessey bears the greater apportionment of fault.  The accident would have been prevented had Blessey's Captain Shoemaker been attentive and aware of his surroundings, rather than being on his personal cell phone while operating the PAUL E. LORD and before shifting it forward an additional four to five feet.  As noted above, Captain Shoemaker had line of sight of Wood and Turner, and he should have exercised his Stop Work Authority because Turner inappropriately placed a mooring line on an open chock.  Blessey shoreside management were aware of Captain Shoemaker's cell phone use and should have enforced their cell phone policy.

85. Additionally, Savage and Blessey's inadequate safety meeting contributed to Wood's injuries.  A proper safety meeting between all captains and deckhands involved where safety, rigging, and the available deck fittings could be discussed would have likely prevented the accident.

86. Savage, as the fleet operator, also should have properly trained its deckhands on open chocks—a type of deck fitting that Savage knew, or should have known, was regularly present in its fleet.

87. Based on the evidence presented, the Court finds that Savage's apportionment of fault is 30 percent and Blessey's apportionment of fault is 70 percent. The damages owed to each party will be based on this allocation and determined during a subsequent state court trial.

## K. Costs

88. The Court finds that Wood is entitled to court costs. *See Dixie Marine*, 2017 WL 3600574, at *13.

89. Wood shall submit the costs he believes he is entitled to within fourteen (14) days of the entry of this order.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that:

1. Petitioner Blessey is liable for negligence under general maritime law for Claimant Justin Wood's injuries and has not proven that it lacked privity or knowledge of the negligent conditions that caused these injuries. Petitioner Blessey is therefore not entitled to exoneration from or limitation of liability under the Limitation of Liability Act.

2. Petitioner EMS is not liable for negligence under general maritime law for Claimant Justin Wood's injuries. Petitioner EMS is therefore entitled to exoneration from liability under the Limitation of Liability Act.

3. Savage, a now settled party, is liable for negligence under the Jones Act and general maritime law for Claimant Justin Wood's injuries for purposes of apportionment of fault.

4. Claimant Justin Wood was not comparatively negligent.

5. Fault is apportioned:

    a. Savage: 30%

    b. Blessey: 70%

c.  EMS: 0%

d.  Wood: 0%

**IT IS ORDERED** that Petitioner Blessey's Complaint for Exoneration from and Limitation of Liability is hereby **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Petitioner EMS's Complaint for Exoneration from and Limitation of Liability is hereby **GRANTED**, and all claims against EMS are hereby **DISMISSED** with prejudice.

**SIGNED this 17th day of May, 2021.**

_Michael J. Truncale_

Michael J. Truncale
United States District Judge